1    WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Guadalupe Ramon Ortiz,                    No. CV-12-00903-TUC-BPV

10                          Plaintiff,         **ORDER**

11          v.

12   Carolyn W. Colvin, Acting Commissioner
     of Social Security,

13                          Defendant.

14          Plaintiff, Guadalupe Ray Ortiz, filed this action for review of the final decision of

15   the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Plaintiff presents

16   three issues on appeal: (1) whether the Administrative Law Judge ("ALJ") erred by

17   giving "no weight" to the examining and treating mental health practitioners' opinions;

18   (2) whether the ALJ's determination that Plaintiff's testimony was not credible was based

19   on substantial evidence; and (3) whether Plaintiff is entitled to a finding of disability if

20   his mental and nonexertional impairments are properly included in the residual functional

21   capacity determination and hypothetical posed to the vocational expert ("VE"). (Doc. 18.)

22   Pending before the court is an Opening Brief filed by Plaintiff (Doc. 18), and the

23   Commissioner's Opposition (Doc. 25). Plaintiff did not file a reply brief.

24          The United States Magistrate Judge presides over this case pursuant to 28 U.S.C. §

25   636 (c) and Fed.R.Civ.P. 73, having received the written consent of both parties.

26          The Defendant's decision denying benefits is reversed and remanded for further

27   proceedings consistent with this order.

28

1    I.    **Procedural History**

2        Plaintiff filed an application for Disability Insurance Benefits ("DIB") in February

3    2008, alleging an onset of disability beginning December 22, 2002[1], due to morbid

4    obesity, chronic pain, diabetes, high blood pressure, knee injuries, shoulder injury, back

5    pain and sleep apnea. Transcript/Administrative Record ("Tr.") 204-06, 231, 235. The

6    application was denied initially and on reconsideration. Tr. 87-88, 108-11, 113-15.

7    Following an administrative hearing held on September 29, 2009, the ALJ issued a

8    decision finding Plaintiff not disabled within the meaning of the Social Security Act. Tr.

9    29-68, 92-99. The Appeals Council granted a request for review and vacated the hearing

10   decision and remanded the case to the ALJ for additional evidence and further evaluation.

11   Tr. 105-107.

12       On remand, a second administrative hearing was held before the ALJ on August 9,

13   2011. Tr. 43-68. The ALJ issued a decision on October 26, 2011, finding Plaintiff not

14   disabled. Tr. 22-31. This decision became the Commissioner's final decision when the

15   Appeals Council denied review. Tr. 1-3. Plaintiff then commenced this action for judicial

16   review pursuant to 42 U.S.C. § 405(g). (Doc. 1)

17   II.    **The Record on Appeal**

18            a.   Plaintiff's Background and Statements in the Record

19       Plaintiff was age 53 on his December 22, 2002 alleged onset date, and age 60 on

20   December 31, 2009, Plaintiff's date last insured. Tr. 204, 211. Plaintiff graduated from

21   college with a Bachelor's degree in business management and worked for a telephone

22   company for 27 years as a regulatory director. Tr. 72, 236, 240, 689.

23       Plaintiff testified at a hearing before the ALJ on September 9, 2009 that he was

24   laid off from his employment with the phone company in December 2002. Tr. 73-74.

25   Prior to that, while he was working, Plaintiff started having problems with pain and with

---

[1] Plaintiff alleged an onset date of January 2, 2006 in his initial filing. Tr. 204. Plaintiff alleged an onset date of December 22, 2002 in his Disability Report. Tr. 231. This earlier date was utilized in determining Plaintiff's eligibility for benefits throughout the administrative proceedings below. *See* Tr. 24.

1   sleep apnea. Tr. 74-75. When Plaintiff stopped taking Advil due to kidney problems, it

2   became more difficult for Plaintiff to do a lot of the things he used to do. *Id*. Plaintiff

3   hoped to get a career in real estate, but was unable to complete real estate school because

4   he "just couldn't follow up." Tr. 74, 76.

5         Plaintiff began taking Lyrica for pain after his doctor diagnosed him with

6   fibromyalgia in the year before the hearing. Tr. 75-76. Plaintiff has a lot of back pain,

7   can't sit for long periods of time and his back goes out. Tr. 76. Plaintiff also has a lot of

8   pain with his knees and shoulders, and has had surgery on both. *Id*. Plaintiff had good

9   results from two separate knee surgeries, but has to be careful and can't get on his knees

10  anymore. Tr. 77. After the surgeries on both shoulders, he still has a little pain and has to

11  be careful with what he does. Tr. 82.

12        In addition to the pain and sleep apnea, Plaintiff has depression and sometimes

13  spends days in bed. Tr. 76. Plaintiff testified initially that his "mind is fine" but later

14  testified that his pain takes away a lot of his concentration Tr. 81-82.

15        Plaintiff doesn't do much as much at home as he wants to, and if he does a project,

16  "maybe within 45 minutes that's it for the rest of the day." Tr. 78. He can barely get

17  home after going shopping for groceries, and gets tired very easily. *Id*. Plaintiff testified

18  he has difficulty getting up in the morning and getting dressed. Tr. 80-81.Sitting for long

19  periods of time hurts his back, and typing would hurt his fingers. Tr. 81. Plaintiff testified

20  that he counted up to 90 visits in the last year for doctor's appointments. Tr. 83.

21        Plaintiff testified at the second hearing, on August 9, 2011 that his problems with

22  sleep apnea started before he was laid off and that the problems affected his work

23  performance. Tr. 60. Plaintiff tried using a CPAP (Continuous Positive Airway Pressure)

24  machine for sleep apnea "at least eight times" but couldn't sleep with it. Tr. 61-62.

25  Plaintiff tried lap band surgery for his obesity, but it didn't work as he had a horrible

26  feeling in his throat after eating. Tr. 66.

27        A vocational expert ("VE") testified that Plaintiff's past relevant work was highly

28  skilled, with a specific vocational preparation ("SVP") score of 8. Tr. 73. The VE

1  testified that Plaintiff's skills would be considered transferable, but doubted it would be a
2  very easy lateral transfer. Tr. 58.

3      The VE testified that Plaintiff would not be able to perform his prior relevant work
4  as the VE had outlined in the Dictionary of Occupational Titles ("DOT") when Plaintiff's
5  attorney posed the following hypothetical: marked limitations in his ability to perform
6  activities within schedule, maintain regular attendance, complete a normal work day and
7  work week without interruption from psychologically-based symptoms, and to perform
8  with a consistent pace without unreasonable number and length of rest periods; and
9  moderate limitations in his ability to maintain attention and concentration for extended
10  periods, ask simple questions or request assistance, and accept instruction and respond
11  appropriately to criticism from supervisors. Tr. 67-68.

12                  b.  Relevant Medical Evidence Before the ALJ[2]

13                          i.  *Treating Sources*

14      Plaintiff was treated from 2005 to 2008 at West Horizons Medical Center, Tucson,
15  Arizona, by Surekha Bandlamuri, M.D. Dr. Bandlamuri's treatment notes reflect
16  Plaintiff's history and reports of depression, and the prescribed treatment of
17  antidepressants, fluoxetine (Prozac), and bupropion (Wellbutrin). Tr. 433-42. Dr.
18  Bandlamuri completed two physicals of Plaintiff, one in October 2005, and another in
19  November 2007, in which she noted in a check box form that Plaintiff's "[j]udgment and
20  insight are within normal limits", "[r]ecent and remote memory intact", and "[n]o mood
21  disorders noted, calm affect." Tr. 395, 397. Nonetheless, Dr. Bandlamuri's more detailed
22  treatment notes indicate that throughout the treatment period she continued to assess and
23  treat Plaintiff for depression. Tr. 385.

24      In August 2008, Dr. Bandlamuri completed a disability form noting that Plaintiff
25  has a history of depression, that he does not currently have a significant mental

---

26
27      [2] Plaintiff raises no issues regarding the findings of the ALJ in respect to the
    evaluation of physical or exertional limitations by treating sources, thus the Court
28  summarizes in this section only the evidence related to Plaintiff's claim that the ALJ
    erroneously assessed his mental impairments.

impairment, but that his mental condition causes significant interference with functioning in usual daily activities as it "may cause lack of motivation to shower, take med[ication]s, etc." Tr. 568.

### ii.   Examining Sources

Susan Courtney, M.D., a specialist in family practice and occupational medicine, performed a disability evaluation of Plaintiff on June 8, 2008. Tr. 512-514. Dr. Courtney noted Plaintiff is on antidepressants for depression. Tr. 512. Dr. Courtney reported that Plaintiff stated that if his job were still available, he would "go back in a second." Tr. 513. Dr. Courtney did not address Plaintiff's mental limitations as they might affect his ability to work. *See* Tr. 514.

John T. Beck, Ph.D., completed a neuropsychological evaluation of Plaintiff on March 30, 2010. Tr. 688-92. Dr. Beck reviewed Plaintiff's records, conducted a clinical interview, and administered numerous tests for purposes of the evaluation. Tr. 688-89. Dr. Beck explained that, while it can often be problematic to obtain test results which accurately represent a person's true level of ability because financial compensation may be at stake, there was "no indication in this evaluation that [Plaintiff] was not fully cooperating or putting forth his best effort." Additionally, Plaintiff "was administered instruments specifically designed to measure his motivation and cooperation" and the "results indicate that [Plaintiff] was adequately motivated during testing and that the scores reported … should be considered valid." Tr. 691.

Dr. Beck concluded that Plaintiff test results demonstrated "moderate deficits in higher cortical function with significant impairments in abstract reasoning, judgment, insight, memory, planning ability, organizational skills, and skills requiring concentration and attention." Tr. 691. Additionally, there were "significant signs of attentional deficits" and abnormal memory. *Id*. Dr. Beck's diagnostic impressions and conclusions were as follows:

> In his interactions with me, the examinee's behavior was not normal. He
> displayed an agitated depression, fine motor tremor, and looked quite

impaired. On today's testing, he demonstrates a clear loss of neuro-cognitive efficiency, coupled with significant pain guarding behavior.

…

On neuropsychological exam, the examinee demonstrated objective moderate deficits in diffuse brain function.

It is important to note that there was no objective or subjective indication of poor cooperation or lack of effort.

The examinee clearly seems unable to return to work at this juncture. Limitations would include any type of new learning, difficulty with sustained concentration and attention, problems with planning and thinking.

Tr. 692.

### iii.   Non-Examining State Agency Medical Sources

Randall J. Garland, Ph.D., completed a Psychiatric Review Technique assessment for the period from March 2002 to May 2008, based on Plaintiff's diagnosis of depression. Tr. 498-511. In the Paragraph "B" Criteria of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1), Dr. Garland rated Plaintiff's functional limitations, finding mild restriction of activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr. 508. Dr. Garland noted that Dr. Barker's opinion that Plaintiff had minimal adaptation and inability to engage in social interaction was inconsistent with Plaintiff's own report of his functionality. Tr. 510.

Hubert Estes, M.D., reviewed Dr. Bandlamuri's opinion and affirmed the initial mental assessment, noting that Dr. Bandlamuri did not note "any significant limitation in functioning." Tr. 569.

### iv.   Other sources

William T. Barker, Ed.D., wrote a letter on May 5, 2008, stating that he treated Plaintiff weekly from May 1991 through September 1992. Tr. 481. Plaintiff suffered mixed anxiety-depressive symptoms which were clinically significant and impaired his

social and occupational functioning. *Id*. Since that time Dr. Barker reported Plaintiff continued to receive psychotherapy semi-monthly for continued symptoms of Dysthymic Disorder, and that Plaintiff suffers from depressed mood, over eating, insomnia, low energy, fatigue, low self-esteem, poor concentration and feelings of hopelessness. *Id*. Dr. Barker noted that Plaintiffs co-morbid conditions have a serious impact on Plaintiff's emotional health, and that he has become increasingly depressed, suffering diminished self-esteem, and feelings of hopelessness. *Id*. Dr. Barker concluded that Plaintiff's use of anti-depressants has had limited results. *Id*. Finally, Dr. Barker opined that "with [Plaintiff's] current physical limitations and mental diagnosis he has minimal adaptation and [is] unable to engage in social interaction. His prognosis is guarded."

Dr. Barker completed a Mental Residual Functional Capacity Assessment on September 2, 2009. Tr. 678-679. Dr. Barker noted that Plaintiff would be moderately limited in his ability to maintain attention and concentration for extended periods, to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. Dr. Barker noted that Plaintiff would be markedly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. Dr. Barker noted Plaintiff suffers from moderate symptoms of disorientation to time and place, emotional lability and impairment in impulse control and thoughts of suicide. Tr. 679. Dr. Barker noted marked symptoms of change in personality, disturbance in mood, emotional withdrawal and/or isolation, appetite disturbance with change in weight, sleep disturbance, or pervasive loss of interest in almost all activities, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and recurrent obsessions or compulsions. *Id*.

1    In December 2011, Dr. Barker, having reviewed Dr. Beck's evaluation, concurred

2    with Dr. Beck's evaluation from the test results provided, and opined that he believed that

3    the neuropsychological test results adequately represented the cognitive impairments and

4    limitations that Dr. Barker had observed during the time he treated Plaintiff between 2002

5    and 2009. Tr. 701.

6                              c.   The ALJ's Findings

7    The ALJ found that Plaintiff had not engaged in substantial gainful activity from

8    the alleged onset date of December 22, 2002 through his date last insured, December 31,

9    2009. Tr. 24 ¶ 2. The ALJ found that through the date last insured Plaintiff has the severe

10   impairments of obesity, obstructive sleep apnea, degenerative disc disease of the lumbar

11   spine, degenerative joint disease of the shoulders and right knee, and osteoarthritis of the

12   right hip. Tr. 25, ¶ 3. The ALJ found that Plaintiff's impairments, including his mental

13   impairment, do not meet or equal a listed impairment. Tr. 27, ¶ 4. The ALJ further found

14   that in considering Plaintiff's mental impairment, the "paragraph B" criteria were not

15   satisfied because Plaintiff had only mild restrictions in his activities of daily living; mild

16   difficulties in social functioning, mild difficulties with regard to concentration,

17   persistence or pace; and no episodes of decompensation which have been of extended

18   duration, and thus Plaintiff's mental impairment was nonsevere Tr. 26. The ALJ stated

19   that the RFC determination reflected the degree of limitation the ALJ found in the

20   "paragraph B" mental function analysis. Tr. 26. The ALJ found that Plaintiff had the RFC

21   to perform a full range of sedentary work. Tr. 27, ¶ 5.  The ALJ found that Plaintiff was

22   capable of performing past relevant work as a director of regulatory agency/director of

23   compliance/director of licensing and regulations, and concluded that Plaintiff was not

24   under a disability from December 2, 2002 through December 31, 2009. Tr. 30, ¶¶ 6-7.

25   **III.   Discussion**

26                              a.   Standard of Review

27   The Court has the "power to enter, upon the pleadings and transcript of the record,

28   a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner's decision to deny benefits "should be upheld unless it is based on legal error or is not supported by substantial evidence*." Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). In determining whether the decision is supported by substantial evidence, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (quoting *Robbins v. Commissioner, Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

Whether a claimant is disabled is determined using a five-step evaluation process. To establish disability, the claimant must show (1) he has not worked since the alleged disability onset date, (2) he has a severe impairment, and (3) his impairment meets or equals a listed impairment or (4) his residual functional capacity (RFC) precludes him from performing his past work. At step five, the Commissioner must show that the claimant is able to perform other work. *See* 20 C.F.R. §§ 404.1520(a).

b.  Analysis

i.  *Treating Sources*

Plaintiff argues that the ALJ erred in giving no weight to the opinion of Dr. Bandlamuri. (Doc. 18, at 16.) The Commissioner responds that the ALJ reasonably assigned Dr. Bandlamuri's opinion "no weight" because it was inconsistent with the record evidence regarding Plaintiff's mental health treatment. (Doc. 25, at 13.) The Court finds that the ALJ erred in giving Dr. Bandlamuri's opinion no weight.

The ALJ acknowledged Dr. Bandlamuri as Plaintiff's treating physician. Tr. 29. Generally, "more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). Medical opinions and conclusions of treating physicians are accorded special weight because these physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see*

1    *also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A

2    treating physician's opinion is entitled to 'substantial weight.'"). If a treating doctor's

3    opinion is not contradicted by another doctor (*i.e.*, there are no other opinions from

4    examining or nonexamining sources), it may be rejected only for "clear and convincing"

5    reasons supported by substantial evidence in the record. *See Ryan*, 528 F.3d at 1198;

6    *Lester*, 81 F.3d at 830.

7        Clear and convincing reasons are also required to reject a treating doctor's

8    ultimate conclusions. *Lester*, 81 F.3d at 830 (citing *Embry v. Bowen*, 849 F.2d 418, 422

9    (9th Cir. 1988)). Although the ALJ "'is not bound by the uncontroverted opinions of the

10   claimant's physicians on the ultimate issue of disability, . . . he cannot reject them

11   without presenting clear and convincing reasons for doing so.'" *Matthews v. Shalala*, 10

12   F.3d 678, 680 (9th Cir. 1993) (quoting *Montijo v. Sec'y of Health & Human Servs.*, 729

13   F.2d 599, 601 (9th Cir. 1984) (per curiam)); *see also Reddick v. Chater*, 157 F.3d 715,

14   725 (9th Cir. 1998) (stating that "reasons for rejecting a treating doctor's credible opinion

15   on disability are comparable to those required for rejecting a treating doctor's medical

16   opinion"); *Lester*, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ can meet this " 'burden by

17   setting out a detailed and thorough summary of the facts and conflicting clinical

18   evidence, stating [her] interpretation thereof, and making findings.' " *Tommasetti v.

19   Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Magallanes v. Bowen*, 881 F.2d 747,

20   751 (9th Cir. 1989)). The Social Security Administration has explained that an ALJ's

21   finding that a treating source medical opinion is not well-supported by medically

22   acceptable evidence or is inconsistent with substantial evidence in the record means only

23   that the opinion is not entitled to controlling weight, not that the opinion should be

24   rejected. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (citing SSR 96-2p at 4,

25   available at 61 Fed.Reg. 34,490, 34,491; 20 C.F.R. § 404.1527). Treating source medical

26   opinions are still entitled to deference and, "[i]n many cases, will be entitled to the

27   greatest weight and should be adopted, even if it does not meet the test for controlling

28   weight." *Orn*, 495 F.3d at 632; *see also Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.

1983) ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.").

The ALJ rejected Dr. Bandlamuri's opinion because "[t]reatment for his depression was limited to medication and apparently psychotherapy. There is no evidence of psychiatric admissions or emergency visits for his symptoms. Hence, her opinion is given no weight." Tr. 29-30. Dr. Bandlamuri's opinion that Plaintiff was suffering from depression is uncontradicted in the medical record. To the extent Dr. Bandlamuri's disability opinion, or conclusion that Plaintiff's mental condition causes significant interference with functioning in usual daily activities because of a lack of motivation to care for himself differ from those of the state agency non-examining physician's, the conclusions of the non-treating physician are not "substantial evidence." *See Orn,* 495 F.3d at 632 ("When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'").

The ALJ's reliance on lack of psychiatric admissions or emergency visits is insufficient to support the ALJ's decision to give Dr. Bandlamuri's opinion no weight. As the ALJ noted in his opinion, the agency considers four broad functional areas set out in the disability regulations for evaluating mental disorders. *See* Tr. 26. One of these areas involves activities of daily living. *See generally* the Listing of Impairments, *supra*. Dr. Bandlamuri opined Plaintiff's mental condition would cause some limitations due to lack of motivation. A separate area of limitation set out in the regulations involves episodes of decompensation. *Id*. Dr. Bandlamuri did not opine that Plaintiff had suffered or would suffer any episodes of decompensation. Thus, the ALJ's decision to reject Dr. Bandlamuri's opinion in its entirety based on the lack of medical evidence of any episodes of decompensation is error, as it relies on the lack of evidence of one category of functional limitation to disregard evidence of another. Additionally, the ALJ's conclusion that Plaintiff's limitations are inconsistent with his prescribed treatment is an

impermissible interpretation of the medical evidence. "[W]hile an [ALJ] is free to resolve issue of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999)(ALJ improperly relied on his interpretation of Plaintiff's testimony over medical opinions); *Gonzalez Perez v. Health & Human Servs*, 812 F.2d 747, 749 (1st Cir. 1987) ("The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician...."). There is no evidence in the record that supports the ALJ's conclusion that in the absence of hospitalization or emergency room visits a mental condition may not cause significant functional limitations. This is an impermissible interpretation of the medical evidence in the record.

### ii.   Examining Source

Plaintiff asserts that the ALJ failed by giving no weight to the opinion of consultative examiner Dr. Beck. (Doc. 18, at 19.) The Commissioner asserts that the ALJ reasonably rejected Dr. Beck's opinion for multiple reasons. (Doc. 25, at 16.)

Dr. Beck assessed Plaintiff with limitations including any type of new learning, difficulty with sustained concentration and attention, and problems with planning and thinking. Tr. 692. Dr. Beck opined that Plaintiff would be unable to return to work. Tr. 692.

The ALJ gave this opinion no weight because Dr. Beck's evaluation occurred in March 2010, "well after the date last insured" and Dr. Beck did not opine that Plaintiff's condition existed prior to December 2009. Tr. 30. Additionally, the ALJ found that the evidence did not support such restrictive limitations "given that his treatment was limited to medication, and, if true, psychotherapy." Tr. 30.

The Ninth Circuit has stated that "reports containing observations made after the period of disability are relevant to assess the claimant's disability." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)(citing *Kemp v. Weinberger*, 522 F.2d 967, 969 (9th Cir.

1975)). "Medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." *Id.* (citing *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985)). The medical evidence of record indicates that Plaintiff underwent mental health treatment beginning in 1991 and continued through at least 2008. *See* Tr. 385, 433-442, 481. Dr. Beck's evaluation, a mere three months after Plaintiff's date last insured, relates to a medical condition that unquestionably existed during the period of disability and is relevant in the analysis of the case. The ALJ erred by giving the opinion no weight. Additionally, Dr. Barker, Plaintiff's treating counselor since 1991, opined that he had reviewed Dr. Beck's evaluation, and believed that the test results adequately represented the cognitive impairments and limitations that Dr. Barker had observed during the time he treated Plaintiff between 2002 and 2009, lending further relevancy to Dr. Beck's report. *See* Tr. 701. The ALJ also erred by rejecting Dr. Beck's opinion in its entirety based on treatment consisting of medication and psychotherapy, as explained above in addressing Dr. Bandlamuri's opinion.

### *iii. Other source*

Plaintiff argues that the ALJ erred in giving the opinion of Dr. Barker, Plaintiff's treating counselor, no weight. (Doc. 18, at 22.) The Commissioner contends that the ALJ provided the requisite germane reasons for discounting Dr. Barker's opinion. (Doc. 25, at 17.)

Dr. Barker's opinion is "not entitled to the same deference" as acceptable medical sources. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("only licensed physicians and certain other qualified specialists are considered '[a]cceptable medical sources.'")(footnote omitted). The ALJ may discount testimony from "other sources" if the ALJ "'gives reasons germane to each witness for doing so.'" *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)).

The ALJ rejected Dr. Barker's summary evaluation of Plaintiff's limitations because "absent the treating notes, it is not possible to compare his evaluation with the

objective findings to determine whether the record adequately supports his opinion." Tr. 30. As the Commissioner correctly explains, an ALJ can discount the opinion of even a treating source when it is unsupported by the provider's own treatment notes. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *Bray,* 554 F.3d 1219, 1228 (9th Cir. 2009) (an ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings" (citation and internal quotation marks omitted)). Accordingly, Mr. Barker's inability to support his own opinion with treatment notes and clinical findings certainly constituted a germane reason for the ALJ to discount his opinion.

### iv.   Plaintiff's Credibility

Plaintiff argues that the ALJ's determination that Plaintiff was not credible regarding his symptoms and limitations is not based on substantial evidence. (Doc. 18, at 24.) Plaintiff testified that he has back pain and can't sit for long periods of time and additionally has pain in his knees and shoulders. Plaintiff also testified he has sleep apnea and depression, and sometimes spends days in bed, and has difficulty getting up in the morning and getting dressed. The ALJ found that Plaintiff's statements concerning his symptoms are "not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 27

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn,* 495 F.3d at 635 (internal quotation marks and citation omitted). Where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing. *Garrison v. Colvin*, --- F.3d --- , 2014 WL 3397218, *16 (9th Cir. 2014); *Tommasetti*, 533 F.3d  at 1039; *Orn,* 495 F.3d at 635*; Robbins,* 466 F.3d at 883. "The

ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Smolen,* 80 F.3d at 1284.  *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.")

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." Tr. 20. As the Seventh Circuit Court of Appeals explains, the manner in which this "boilerplate language" is used in the Commissioner's credibility analysis "gets things backwards." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (Addressing identical language and finding that the "problem is that the assessment of a claimant's ability to work will often … depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility.")

1    As the Court found in *Bjornson*, the statement by the ALJ that Plaintiff's
2  statements were "not entirely credible" yields no clue to what weight the ALJ gave that
3  testimony, and "fails to inform us in a meaningful, reviewable way of the specific
4  evidence the ALJ considered in determining that claimant's complaints were not
5  credible." *Id*. (citations omitted).

6    If, however, "the ALJ has made specific findings justifying a decision to
7  disbelieve an allegation … and those findings are supported by substantial evidence in
8  the record, our role is not to second-guess that decision." *Morgan v. Comm'r Social Sec.*
9  *Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Several courts in this Circuit have found that
10  the mere use of the meaningless boilerplate language is not cause for remand if the ALJ's
11  conclusion is followed by sufficient reasoning. *See e.g. Jones v. Comm. of Soc. Sec.*, 2012
12  WL 6184941, at * 4 (D.Or. 2012) (boilerplate language is a conclusion which may be
13  affirmed if the ALJ's stated reasons for rejecting the plaintiff's testimony are clear and
14  convincing); *Bowers v. Astrue*, 2012 WL 2401642, at *9 (D.Or. 2012)(concluding that
15  this language erroneously reverses the analysis, but finding such error harmless because
16  the ALJ cited other clear and convincing reasons for rejecting the claimant's testimony).
17  The Court adopts this reasoning, and, despite the use of the boilerplate language which
18  implies improper analysis, considers whether the ALJ's conclusion in this case is
19  nonetheless supported by clear and convincing evidence.

20    The ALJ first found that Plaintiff's alleged limitations and restrictions are not
21  supported by the evidence and, specifically in terms of Plaintiff's obesity, Plaintiff has
22  not followed through with medical recommendations to lose weight. Tr. 27. The Social
23  Security Agency has explained that a " 'prescribed treatment' is a term of art", meaning
24  that the "treatment must be prescribed by a treating source, … not simply recommended.
25  A treating source's statement that an individual 'should' lose weight or has 'been
26  advised' to get more exercise is not prescribed treatment." *Orn*, 495 F.3d at 637 (citing
27  S.S.R. 02–1p at 9, 67 Fed.Reg. at 57,864). There is no evidence that, aside from the lap
28  band surgery, Plaintiff was ever prescribed treatment for obesity.

Even if the medical records suggesting or advising Plaintiff to lose weight were a prescribed treatment, a finding of a "failure to follow prescribed treatment" would be inappropriate unless the record also suggests that there was any chance of such a prescription succeeding in eliminating or ameliorating Plaintiff's obesity, let alone "clear evidence" that the treatment would be successful. *See id*. There is no evidence in the record that the mere "medical recommendations" to lose weight cited by the ALJ stood any chance of succeeding in treating Plaintiff's obesity.  There is evidence in the record, however, that when Plaintiff's treating sources provided more than a recommendation, but a comprehensive weight loss program in which Plaintiff's weight loss attempts were supported by weekly medical monitoring, group support, exercise and education, he was successful in losing 90 pounds. Tr. 315.

Finally, although a failure to seek treatment or follow a prescribed treatment when a Plaintiff has complaints of disabling pain may be used as the basis for finding a Plaintiff's complaints unjustified or exaggerated, in the case of obesity, "where medical treatment is very unlikely to be successful, the approach to credibility makes little sense" and "… the failure to follow treatment for obesity tells us little or nothing about a claimant's credibility." *Id*. at 638. Thus, there is no reason to conclude from Plaintiff's failure to lose weight that he is not telling the truth about his symptoms.

The ALJ also noted that Plaintiff was noncompliant with treatment for his diabetes and sleep apnea. Tr. 28. The ALJ's conclusion is supported, in part, by substantial evidence in the record. Dr. Bandlamuri's progress notes indicated that Plaintiff was not checking his blood sugar levels, although there is no indication that he was not taking prescribed medication for diabetes. *See* Tr. 358, 385-86. Nonetheless, as noted by the ALJ, his lab results suggested that his blood sugar levels remained largely uncontrolled through the time at issue. *See eg*. Tr. 362, 382-83, 405-07, 410, 411, 414-15. The ALJ also mischaracterizes Plaintiff's "refusal" to use a CPAP machine to alleviate his sleep apnea. Tr. 28. Plaintiff testified, and progress notes from Dr. Bandlamuri as well as John R. Harris, M.D., indicated that Plaintiff had difficulty sleeping with the CPAP machine

1    for treatment of his sleep apnea. Tr. 61-62, 578, 590. It remains unclear however, despite

2    the disabling symptoms Plaintiff attributed to sleep apnea, why he did not pursue the

3    surgical options suggested by Dr. Harris. *See* Tr. 578.

4        Next, the ALJ addressed Plaintiff's complaints of back and hip pain, and found

5    that "the evidence of mild to moderate degenerative changes … were not severe enough

6    to account for his alleged symptoms and limitations." Tr. 28. The ALJ, however, may not

7    discredit Plaintiff's allegations of pain solely on the ground that the allegations are

8    unsupported by objective medical evidence. *See Bunnell*, 947 F.2d   345, 347-48

9    (declining to conclude that Congress intended to require objective medical evidence to

10   fully corroborate the severity of pain while aware of the inability of medical science to

11   provide such evidence.) In addition to consideration of the objective medical evidence,

12   the ALJ also considered that Plaintiff "received little to no treatment for his complaints as

13   [t]he claimant admitted he only sought chiropractic treatment for his back pain." Tr. 28.

14   This statement is not supported by substantial evidence.

15       Though there is little evidence that Plaintiff sought treatment for his back pain

16   throughout most of the period at issue, in May 2008, Plaintiff did seek medical attention

17   for severe pain in his lower back which went down his right leg and he was unable to sit

18   down. Tr. 531. Dr. Bandlamuri diagnosed Plaintiff with low back pain and sciatica and

19   prescribed Vicodin, Neurontin, and Flexeril and administered a Toradol injection. Tr.

20   531. In June 2008, Plaintiff reported pain in his whole body, at times being unable to

21   move at all upon waking. Tr. 533. Dr. Bandlamuri diagnosed Plaintiff myalgia, arthralgia

22   and low back pain, and prescribed Lyrica and Plaintiff was again given a Toradol

23   injection. Tr. 533-34. An MRI of the lumbar spine demonstrated multilevel degenerative

24   changes including disc bulges and foraminal narrowing, and mild spinal canal stenosis.

25   Tr. 537.  Dr. Bandlamuri again assessed Plaintiff with low back pain in July 2008, but

26   prescribed nothing further and performed no procedures. Tr. 535. In October 2008,

27   Plaintiff again reported back problems. Tr. 663. Dr. Bandlamuri recommended Tylenol

28   for his pain. Tr. 664. Dr. Bandlamuri completed a physical RFC assessment on

September 1, 2009, and noted limitations due to "Obesity, (R) hand pain, low back pain." Tr. 680. Additionally, Plaintiff reported that he stopped chiropractic treatments due to a lack of financial ability to pay for them. Tr. 249. Thus, there is no support in the record for the ALJ's belief that Plaintiff received little to no treatment for his pain throughout the entire period in question.

The ALJ also asserted that as to the left shoulder condition the Claimant "refused to even try cortisone injections." Tr 28-29. Again, the ALJ's statement mischaracterizes the record. In August 2007, upon observing a positive impingement and slight weakness in Plaintiff's left shoulder, Plaintiff's treating physician, Dr. Slagis "advised him that cortisone [injection] is the standard of care." Tr. 428. Plaintiff explained that "…he does not want to do that since it did not last him previously and he simply wants to have something more definitive done." Tr. 428. Plaintiff wanted to "proceed immediately with something more aggressive." Tr. 428. The treatment note continues with the doctor recommending an MRI be done before surgical intervention and the Plaintiff "very much wants to go in that direction." Tr. 428. The doctor indicates that he will obtain the MRI. Tr. 428. Subsequently, however, in September 2007, Plaintiff reported that his shoulder felt "fine" and he did not want a cortisone injection as his shoulder was not bothering him at that time. Tr. 427. Plaintiff was advised to return for cortisone injections if the problem got worse in the future. Tr. 427. Thus, despite the ALJ's mischaracterization of the record regarding Plaintiff's refusal to treat his shoulder condition, there is nonetheless substantial evidence in the record that supports the ALJ's conclusion that Plaintiff's left shoulder was not bothering him significantly.

Finally, the ALJ noted that Plaintiff's level of functioning is inconsistent with his alleged limitations. Tr. 29. The ALJ noted that Plaintiff had little difficulty performing personal care tasks, was able to prepare simple meals, wash dishes, do laundry, and clean up. *Id*. The ALJ also noted that Plaintiff was able to drive and shop for groceries, manage his finances, met with friends for meals and movies, and denied difficulty with social

1   interactions. *Id*. Plaintiff correctly notes that the ALJ erred by mischaracterizing the

2   record and ignored Plaintiff's most recent record of activities of daily living.

3       Plaintiff submitted a function report on April 18, 2008, stating that he was able to

4   do light house chores such as washing clothes and dishes, grocery shopping, and watering

5   plants. Tr. 242. Plaintiff stated that he occasionally went to the theatre. Tr. 242. Plaintiff

6   did report difficulty walking, concentrating, putting on socks and shoes, and sleeping, due

7   to pain in his leg. At that time Plaintiff also reported trouble rising from a sitting position.

8   Tr. 243. The ALJ noted that Plaintiff did not report using any assistive device at that

9   time. Tr. 29.

10      By June 2008 however, Dr. Susan Courtney, a consultative examiner, reported that

11  Plaintiff was in fact using an assistive device to walk, which she felt was necessary at that

12  time for Plaintiff for balance and pain.[3] Tr. 514.  In July 2008, Plaintiff submitted a

13  disability report noting that he was having difficulty driving, dressing, cooking and

14  eating. Tr. 255. Plaintiff reported chronic pain making it difficult to shower, shave, get

15  dressed, and to go grocery shopping. Tr. 260. Plaintiff reported limited use of his hands

16  due to intense pain which interfered with his ability to cook. Tr. 260. Plaintiff also

17  reported that it was difficult to sit for more than 30 minutes. Tr. 260.

18      The ALJ erred by ignoring this supplemental report and relying solely on the

19  previous report to discredit Plaintiff's allegations of limitations. This Court cannot rely

20  on only the evidence that supports the ALJ's conclusion to affirm the ALJ's decision, but

21  must consider all of the evidence. *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.

22  1989) ("a reviewing court must review the record as a whole and consider adverse as well

23  as supporting evidence.") The Commissioner's decision cannot be affirmed "simply by

24  isolating a specific quantum of supporting evidence." *Id*. (citing *Jones v. Heckler*, 760

25

26      [3] The ALJ also relied on the absence of an assistive device to give little weight to
    the State agency medical consultant's physical assessment, as the consultant noted
27  Plaintiff used a crutch to walk and Plaintiff had not reported using a cane, and none had
    been prescribed. Tr. 29. As evidenced by Dr. Courtney's examination, however, Plaintiff
28  was using an assistive device for walking and Dr. Courtney felt that it was necessary for
    him. Tr. 514.

1  F.2d 993, 995 (9th Cir. 1985)). This is especially true when Plaintiff's complaints involve

2  degenerative diseases.

3      At least as to Plaintiff's supplemental report, Plaintiff's described activities do not

4  contradict his testimony regarding his limitations. *See Fair v. Bowen*, 885 F.2d 597, 603

5  (9th Cir. 1989) ("if a claimant is able to spend a substantial part of his day engaged in

6  pursuits involving the performance of physical functions that are transferable to a work

7  setting, a specific finding as to this fact may be sufficient to discredit an allegation of

8  disabling excess pain."). Additionally, the limitations in daily activities evidenced by the

9  most recent statements of pain and loss of capacity to perform ADL's clearly show an

10  inability to engage in activities "easily transferable to what may be the more grueling

11  environment of the workplace…[.]" *Id.* at 603. The Court agrees with Plaintiff that his

12  inability to dress himself and to sit for more than 30 minutes would be inconsistent with

13  an ability to engage in most forms of work. *See Gallant v. Heckler,* 753 F.2d 1450, 1454

14  (9th Cir. 1984) (When the medical evidence and claimant's testimony depict an individual

15  who cannot sit, stand or walk for over one hour without pain the individual "does not

16  have the capacity to do most jobs available in the national economy.")(quoting *Delgado*

17  *v. Heckler*, 722 F.2d 570, 574 (9th Cir. 1983).

18      An ALJ's error may be harmless where the ALJ has provided one or more invalid

19  reasons for disbelieving a claimant's testimony, but also provided valid reasons that were

20  supported by the record. *See Bray*, 554 F.3d at 1227; *Carmickle v. Comm'r Social Sec.*

21  *Admin,* 533 F.3d 1155, 1162–63; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190,

22  1195–97 (9th Cir. 2004). In this context, an error is harmless so long as there remains

23  substantial evidence supporting the ALJ's decision and the error "does not negate the

24  validity of the ALJ's ultimate conclusion." *Batson*, 359 F.3d at 1197; *see also Carmickle*,

25  533 F.3d at 1162.

26      The Court finds that the ALJ's articulated reasons for discounting Plaintiff's

27  credibility were not clear and convincing. Specifically, the ALJ's findings regarding

28  Plaintiff's noncompliance with treatment for obesity and Plaintiff's failure to seek

treatment for back and hip pain after May 2008 are not supported by substantial evidence in the record. The ALJ's findings of Plaintiff's noncompliance with treatment for sleep apnea is also not supported in its entirety, and further, the ALJ's findings regarding Plaintiff's activities of daily living were also not entirely supported by substantial evidence, especially as to the Plaintiff's supplemental report of ADL's which was not addressed by the ALJ.

## IV.   Remedy

Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, or fails to provide specific, clear, and convincing reasons for rejecting a claimant's testimony, this Court credits the opinion or testimony as a matter of law.  *Lester*, 81 F.3d at 83; *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988). The Ninth Circuit has held that a court should remand to an ALJ with instructions to calculate and award benefits where three conditions are met: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 2014 WL 3397218 (citations omitted). Even when all conditions of the credit-as-true rule are satisfied, a court should nonetheless remand for further proceedings when "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Id*. A district court abuses its discretion, however, by remanding for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that the claimant is not, in fact, disabled. *Id*.

As discussed above, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Bandlamuri and Dr. Beck. The ALJ also failed to provide legally sufficient reasons for finding Plaintiff's testimony not credible in its entirety.

To be eligible for benefits, Plaintiff must have been disabled on or before his last

insured date, December 31, 2009. *See* 20 C.F.R. § 404.315. While the improperly rejected evidence strongly suggests that Plaintiff became disabled before his insured status lapsed, the determination of the date of onset remains unclear.

First, crediting Dr. Bandlamuri's opinion regarding Plaintiff's mental health establishes that Plaintiff has significant difficulties with functioning in usual daily activities. This opinion was rendered in August 2008, but did not address specific limitations, nor did it address a time period prior to August 2008. Crediting Dr. Bandlamuri's opinion as true establishes that at least as of August 2008, Plaintiff's mental condition would cause significant interference with functioning in usual daily activities. Tr. 568.

It is also not clear from the record that crediting Dr. Beck's opinion as true would establish disability. Though the ALJ erred in failing to give the opinion any weight, Dr. Beck's opinion, rendered three months after the date last insured, did not address the period at issue in this case. Dr. Beck's opinion, however, is legally relevant and entitled to some weight in establishing a date of onset, especially in light of Dr. Bandlamuri's opinion.

On remand, the ALJ should re-examine his findings that Plaintiff's depression was nonsevere and imposed no limitations.

Finally, it is not clear that crediting Plaintiff's improperly discounted testimony as true would result in a finding of disability throughout the entire period at issue. Because extreme obesity alone does "not correlate with any specific degree of functional loss," *see* SSR 02-1p, crediting Plaintiff's symptoms related directly to obesity do not result in a finding of disability. There was no testimony by Plaintiff that his obesity directly impacted his functional limitations, though the impact and complications from Plaintiff's obesity no doubt contributes to both exertional and non-exertional limitations caused by his degenerative disc and joint disease, diabetes, sleep apnea, and osteoarthritis of his right hip, as well as his mental health condition.

It is also not clear that crediting Plaintiff's improperly discounted testimony

regarding his back pain would result in a finding of disability throughout the entire period at issue. There is no evidence in the record that Plaintiff sought medical treatment for his back and hip pain until May 2008, and thus the ALJ's conclusion that Plaintiff's claim of back pain was not credible because he received little to no treatment for his back pain is valid up until this date. As discussed above, however, crediting Plaintiff's supplemental report (Tr. 255-262) as true, and considering Plaintiff's difficulty with self-care and inability to sit for more than 30 minutes before he must stand and move around, Plaintiff has established that he does not have the capacity for even sedentary work. *See Gallant*, 753 F.2d at 1454 ("A man who cannot walk, stand or sit for over one hour without pain does not have the capacity to do most jobs available in the national economy.")(citing to *Delgado,* 722 F.2d at 574). Plaintiff's supplemental report dated July 9, 2008, indicates that his pain became worse and his physical limitations intensified in approximately 2008, and he was diagnosed with fibromyalgia and depression in July 2008. Thus, there is substantial evidence that Plaintiff's disability began before his insured status lapsed in December 2009. Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated. *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009). Since the determination of the onset date of disability is a factual issue, this matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

IT IS ORDERED that the Defendant's decision denying benefits is REVERSED and this case is REMANDED for further proceedings consistent with this order. The Clerk of Court shall enter judgment in favor of Plaintiff and against the Commissioner and shall terminate this case.

Dated this 24th day of July, 2014.

_____
Bernardo P. Velasco
United States Magistrate Judge